The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Mr. Quinn, we're ready when you are. Good morning, Your Honors. Brian P. Quinn on behalf of the appellant in this case, Robert M. Feldman. Your Honors, this is a single issue appeal. In light of the government's concessions in the briefing, the only remaining question for this Court to answer is whether the sentencing guidelines played their customary role in my client's sentencing. The government has acknowledged that if the answer to that question is yes, then my client is entitled to relief under Strickland v. Washington. The answer is yes. The guidelines served as the starting point and the focal point for my client's sentencing.  The Court told us that it sentenced my client with its guidelines calculation very much in mind. After repeatedly asking counsel to confirm its guidelines calculation, it imposed a guideline sentence within the range it believed to be applicable and at the very bottom of that range. In so doing, it adopted the recommendation of the probation office to impose a sentence at the low end of the applicable guidelines range. And it passed up opportunities to enhance Mr. Feldman's sentence, indicating that it believed the guidelines adequately accounted for the size and magnitude of the case. In every respect that matters accordingly, this was an ordinary case in which the guidelines affected the outcome at sentencing. This is not a case in which the district court indicated that the sentence it chose was appropriate regardless of the guidelines. The Supreme Court held in Molina-Martinez and then again in Rosales-Morales that when those two points are present, the case is dispositive. In a case like this one, in which all parties agreed that the district court erred in imposing a sentence under the wrong guidelines range, it's absolutely clear that the sentencing error affected the outcome because the district court applied the wrong framework at sentencing. Does it make any difference that Molina-Martinez was a plain error case and this is strictly review? So no, I think, is the answer to that question. The framework in the analytical question that the Supreme Court applied in Molina-Martinez was whether there was a reasonable probability of a different outcome at sentencing but for the error. And this court actually held in Carthorn, it's a very similar inquiry to what we see under Strickland. The question is actually the same, whether there's a reasonable probability of a different outcome at sentencing. And actually, in Molina-Martinez, to take up the point, the court said that you don't even need to show that the sentence, that additional evidence that the sentence would have been lower. It's just the fact that the court applied the wrong framework at sentencing that is where the error stems from. I want to turn to a couple of the government's arguments in this case because I think there were... Before you do that, can I ask you, maybe you're going to get to this anyway, but you admit in your brief that there are situations where applying the wrong guideline range can not cause prejudice. Are you looking for some magic words to invoke that? Because I think that's a really difficult argument to make, if that's the argument you're making. That's not the argument I'm making. Okay, so why wouldn't this be among those? Because you've given us an abbreviated and selected version of what the district court did. The district court also made a fairly extensive explanation of why the district court had come to this sentence without looking at the guidelines. There's a whole bunch of other stuff that the district court said that justified its sentence. I think the district court did say a lot at sentencing. Indeed. I think that's also true of every sentencing. That's why I'm asking you, if we don't need magic words, what is it that we need that we didn't have here? Because there was certainly justification for the sentence the district court gave. I agree. And I think what you're looking for is, it's either an express indication that the sentence was appropriate regardless of the guidelines... Well, that's a magic word. That's a magic word. Or some consistent indication in the sentencing transcript that the sentence was appropriate regardless of the guidelines. Well, you pose that the district court did this all because it was within the range. Another way to read this record is that the government was suggesting one sentence, and did you represent the defendant below? I did not, no. Well, whoever did represent the defendant below was suggesting another, and the district court took sentencing at some level between those two suggestions, which district courts often do. I think that's fair. Below the record reflects that while trial counsel argued for a sentence that was lower, trial counsel actually didn't suggest that a lower range was appropriate in this case. Well, okay. Well, that's what you're claiming is the procedural error here, is that right? That's correct. So what trial counsel did was, or failed to do in this case, was object at the critical moment when the district court repeatedly asked him whether its calculation of the range was correct. How is your position different from asking us to apply a presumption of prejudice? So I think I'm not asking you to apply a presumption of prejudice. I'm just asking you to apply the standard that the Supreme Court applies in similar circumstances. And so, in Molina-Martinez, the Supreme Court tells us that when there's a guidelines error in the ordinary case, that alone is sufficient to cause prejudice to a person in this circumstance. The Supreme Court goes through an extended discussion of why the guidelines... That's getting pretty close to a presumption, but you're maintaining that you're not asking for a presumption. Isn't that correct? I don't think you need to decide that there's a presumption in cases like this. I think you can look at the transcript of the sentencing and hold on the basis of the transcript that the guidelines were both the starting point and the focal point here. All of the district court's discussion of various factors are viewed through the prism of the guidelines. And the Supreme Court actually says in Molina-Martinez that the most powerful indicator that the guidelines mattered in a particular case is the fact that the district court sentenced the defendant within the relevant guidelines range. Not only did that happen here, the district court sentenced at the very bottom of the relevant guidelines range. It adopted an express statement from the probation office that it should sentence at the very bottom of the applicable guidelines range. Well, according to Molina-Martinez, Tina said, there may be instances when, despite the application of an erroneous guidelines range, a reasonable probability of prejudice does not exist. I think that's right. Well, and what my colleague is trying to do is to get you to tease out how that case would differ from this case. So I think, I don't think Molina-Martinez is distinguishable from this case. Well, there's that language which the Supreme Court told him to. So you have to deal with that part of the Supreme Court case too. I do, you're right. And I think this court can reference our opening brief in which we suggested that it just applied the same standard on direct review. Well, I think what you're looking for, you know, the cases where a district court, maybe it's not, but you know, district courts sometimes will in effect make an alternative finding as a basis for their sentence and they'll say, you know, even if I got the guidelines wrong, you know, I've looked at the statutory factors, et cetera, et cetera, and this is the correct sentence no matter what. And I would have made this same sentence even if I hadn't considered the guidelines in this setting to be correct. Is that what you're looking for, is the out, so to speak, magic words? I think I don't even need magic words. I think this court can ask whether, as it does on direct review, whether there's some consistent indication in the sentencing transcript that suggests the sentence would be the same even with the guidelines there. Wouldn't the Supreme Court say in Molina-Martinez that when the sentencing court makes an alternative finding with respect to the sentence that that's the exception to a, for lack of a better word, prejudice presumption? I think that's accurate. I think if the district court at sentencing makes an express finding that it would impose the same sentence but for a guidelines error, if the sentence is reasonable, then I think that would suffice. That's sufficient but not necessary is your position? That's my position. But I don't think, I'm not suggesting that this court, if there's not a magic word in the sentencing transcript like that, that this court can never find that a guidelines error did not prejudice a defendant in this situation. What I'm suggesting is that when we're in this position, when we have a guidelines error, there has to be something on the transcript that suggests that the district court didn't view the guidelines as playing their normal or customary role at sentencing, but rather that the sentence was appropriate regardless of what happened. And I think that's just missing in this case, and I think all of the indications here on this sentencing transcript are that the district judge intended to impose a sentence within the guidelines range it believed applicable and at the very bottom of that range. All of the criteria that we see on the transcript here point to a sentence within the range and at the low end of that range. Judge Muntz, I'm sorry, I didn't want to cut you off. No, you didn't cut me off, but I'm just really not sure that's a fair reading of the transcript. We get a lot of sentencing cases, and the district court here was very worried, it seemed to me, took a very specific and individualized assessment of this defendant and was sympathetic to the fact that he had been cooperating, but still regarded deterrence as a really important factor. And so it seemed to me that he weighed all those things and to come up with saying that there's a reasonable possibility, probability of prejudice, I mean, the best you get is a remand, right? Correct, yes. And this record doesn't suggest to me that the district court would do anything other, come up with any other sentence than the one it gave. So I'll make two points in response to that. I think in Montes Flores, this court explicitly said that the district court may address deterrence factors and other factors during sentencing, but that doesn't, that discussion- I understand that, but that record, did you go look at the sentencing transcript in that case? In Montes Flores? Yes. No, I did not. And compared to this, I mean, this is really quite an extraordinary sentencing hearing. And I don't dispute that the district court did a very good job in considering all of the criteria as it was required to do. But what I would suggest is that, as in Montes Flores, going through the 3553 criteria aren't enough to displace the presumption that a guidelines, not the presumption, but to displace or cure prejudice from a guidelines error. But see, I don't, we've tried to, all of us tried to tease out to you, from you, what more is needed. And you say, it isn't automatic, there isn't a bright line rule, there aren't, there aren't magic words. And so, if this isn't it, if there are no magic words, and this isn't it, I don't know what is. I think, you know, in some other cases you see courts that repeatedly say that a sentence is appropriate, regardless of, or appropriate, multiple times say that a sentence, a particular sentence is appropriate. In other cases, you see courts departing upwards from the relevant guidelines range. So in those circumstances, it's not reasonable to infer that the sentence would have been different if the court had gotten the guidelines range wrong. There are a variety of criteria you can look for. Even a sentence at the top end of the relevant guidelines range might suggest the sentence would have been the same, but for the error. But that's not the case here. Here, the district court imposed a sentence at the very bottom of the guidelines range it believed to be applicable. It adopted the probation office's recommendation that it sentence at the very low end of the applicable guidelines range. So this isn't the case. There are other cases in which you could see a consistent indication in the sentencing transcript that the district court believed that the sentence was appropriate, regardless of the guidelines. But I just don't think that this is the case. What the Supreme Court tells us is that OMBEL says that you don't need additional evidence in cases like this, where the court applies an incorrect guideline range. The fact of applying the wrong guidelines range is itself sufficient. That's not what it said, still. I read you the language. It said it didn't say just because you apply the wrong guidelines range, there's prejudice. It didn't say that. I think what the Supreme Court says is in the ordinary case, a guidelines error itself is sufficient. Well, you and I both agreed that the sentencing transcript isn't the ordinary case. I defer to you on that one. And I don't dispute that the district court, you know, there's no question the district court had an exhaustive discussion. And was very concerned about both deterrence and the size of the laws here. That's absolutely true. But what there isn't on this transcript is any indication that it couldn't address those factors through the prism of the guidelines. Everything was through the prism of the guidelines. The district court actually said with respect to that loss amount, it declined to adopt a sophisticated means enhancement because the fraud loss table in the guidelines adequately accounted for the size and magnitude of the case. So everything that the district court says in sentencing suggests that it viewed this case through the prism of the guidelines and believed that the guidelines appropriately addressed the factors that it identified in sentencing. That's the core point here. I see that I'm running out of time here. And I just want to clear up my final point. In this case, Mr. Feldman likely served nine extra months in prison because of the district court's error in calculating his guidelines. The Supreme Court's precedence in Glover and in a series of other cases, that's sufficient for purposes of prejudice. If the guidelines error, we have- If you're correct, but not if you're not correct, it's not nine extra months. That's true. So it's only if I'm correct that he served an additional time in prison. If you're correct that it was prejudicial, then it was prejudicial and he served nine extra months. Correct. Okay. I'll wrap up. Mr. Clark? May it please the court. Good morning. I'm Marty Clark, Assistant United States Attorney for the District of Maryland. Defendant has failed to meet his burden of establishing that the second prong of Strickland has been met. There is no prejudice here and he has failed on that burden because the record in two respects establishes a reasonable probability that Chief Judge Bedard would have imposed the same sentence but for the error. The first, the 3553 analysis that he did at the sentencing hearing, that record, and I can tell the court has looked at it very closely, is really a comprehensive, very careful, very considered, and quite frankly, candid assessment. This report can have a very thorough sentencing colloquy but still rely on the incorrect guidelines. This is not a case like the ones we see from some district courts. Maybe this one sometimes, where the district court makes a very specific alternative finding and says, even if I got the guidelines wrong, this would still be the sentence, here are the reasons why this would be. So it's very clear. But you don't really have anything quite like that in this record. That's correct. The fact that the court was careful and that it was comprehensive is not dispositive. Let's talk about why you don't. Was anybody suggesting that the guidelines range that he was using was wrong? Did anyone suggest? Yes. Well, yes. So at the original sentencing hearing, the government explained in its sentencing memo the fact that the commission had changed that range. We made it very clear, and we also made it very clear, that based upon the plea negotiations and the plea agreement, that the loss, even though it was adjusted up by 50 million, the there was no change. And defense counsel agreed. Unfortunately, Judge Bedar, 10 months later, a year later, found, and we're not contesting, that that was ineffective. That at least he should have made a record. He should have kindly objected. And the fact that- Well, that's what I'm saying. So at the original sentencing, nobody suggested to him that this was the wrong- No, absolutely not. Absolutely not. So it wasn't like he chose, he had two opposing views of what the guideline range was, and he chose the wrong one. That's correct. And to the court's point earlier, Chief Judge Bedar was not looking within the record at the original sentencing hearing to have a minimum sentence within whatever appropriate guideline range was calculated. That was not his goal. A lot of these cases that you see sometimes, the court will say, for example, one case that was mentioned, that the court mentioned, I can only give you the minimum allowed. I wish I could go lower, but I can't. You see those kinds of things. Here, Chief Judge Bedar landed at the bottom of the guidelines, after consideration of all the factors. And an important point in the way counsel for Mr. Feldman looks at the record, and the way the government looks at the record, is that the defense seems to conflate 2B1 loss with the terminology used by Chief Judge Bedar, massiveness, the massiveness of it all. And he just simply equates that to 2B1, a dollar amount. So how would the $148 million change figure come from? Yeah, well, so unfortunately, the district court seized upon that as the most specific number within what would have been the range. We asked... What does that represent? Why is that in the record? So restitution is a separate part of the plea agreement. And so the restitution reflects that part of the Ponzi proceeds. Is that the restitution amount? $148 million and change was the restitution amount. And the court seized upon that as the only number specifically stated within the plea agreement. Now, in the plea agreement, in the statement of facts, we talk about a $267 million loss. We talk about forfeiture, and the defendant agreed to a forfeiture of $275 million. And so the problem for the government is that once the court determined that there was ineffective assistance and that the range had changed, the court, without having a hearing, went right into the plea agreement and saw the $148 million, which is what Mr. Feldman had raised in his petition, and the court seized upon that and found that that was the exact loss. So what's the difference between you get a $275 million amount in one of the agreements and then you've got this $148 million? Yes, so the difference. So, yeah, what's the difference? So in a Ponzi case, when you're calculating loss under 2B1.1, it's the proceeds of the illegal scheme that establishes the loss, the actual and intended loss. And in this case, because it was a Ponzi from the very beginning, there is no economic reality to it. So all the money that they were getting keeps adding up, and the total was about $275 million. That establishes the loss. From the very beginning, they wanted to fleece these victims. Did the defendant stipulate to that amount at some point? Well, the forfeiture amount was $275 million, and we ended up with $178 million in Mr. Schuster means. We did not want to get into the particulars of that, Your Honor, so that's why we agreed to a range. Okay, I'm confused here. You're saying the defendant stipulated the $275 million. I'm not understanding where this $148 million comes in. So the stipulation, in the stipulated statement of facts, Mr. Feldman agreed that the Ponzi scheme resulted in $275 million of loss. But that's in the stipulated statement of facts. What happened is that there are two other numbers that are also in the plea agreement. One is the forfeiture amount, and one is the restitution amount. And how much are they? See, the forfeiture amount was $275 million. Is that the same $275 million? Well, it was originally $300 million. It was interlineated down to $275 million. Is it the same as the proceeds from the... Yes. Yes. Okay. Yes. And then the restitution amount is the amount of that loss that never got back to the victims. Because in a Ponzi scheme, the early investors get their money back, so they're not entitled to restitution. That's why the number is much lower. So that's $170 some... No, that's $148 million. $148. So the $148 is a piece of the $275. Correct. And it's about a minute and a half and change below that $150 million of the overlapping guideline range, which relative to the overall Ponzi scheme is not much of a difference. So is your argument that even under the revised guidelines, he's still responsible for $275? Yes. But frankly, if we were to re-sentence him now, we would probably use $178 million. That's because Mr. Schusterman went to trial, he contested everything, and to make it sort of easy on the government, when we decided the sentencing, we went for $178 million. And that's what we proved. And that's what he stipulated too. So under the $178 million, would he be under the lower guideline now? No, he'd be in the higher because the new guideline range is $150 to $250. And it was always understood between the parties that it was in the neighborhood of $200 million. But because Mr. Feldman pled so early in the process to cooperate, we did not have to nail that down at that time. As you know, a lot of times you learn about laws over a course of time. And that time we just said, well, heck, the guideline range is $100 to $2 million. We know it's up towards $200 million. It's pretty simple. But then the commission, you know, four weeks before changed the guideline range. So you're not arguing now that the higher guideline would apply in this case? I would argue that if we went to resentencing, that the $178 million could be established because Mr. Feldman was Mr. Schusterman's close partner. But the problem is, and it's the government and probably a little bit of the court, that was not fleshed out properly. That we noticed the court about the change in the amendment, but we didn't provide the court with a good number of laws because we just had this range. And so fast forward 10 months later, and now the court doesn't have an exact number. And frankly, I think the court when it looked at the petition decided that evidentiary hearing wasn't necessary. One, because the $1.5 million, the $148 or $178, that overlapping range, plus what the court knew so much about were the particular details of Mr. Feldman's participation in this Ponzi scheme and knew where he wanted to go. So he found that it was ineffective and unprofessional for counsel not to object. However, however, doesn't the inevitable hearing in a case that he tried for six weeks where Mr. Feldman testified, the other co-defendants testified, this was all Judge Bedard had on his table for almost a half a year in the district court. So he knew well what he wanted to do. Tell us why the strictures of Melina Martinez aren't... I was going to ask whether or not they're applicable here, but that kind of goes back to whether the $148 million is the right number or whether it's another number. Well, I think Melina certainly is applicable here. And I think as the court has rightly questioned Mr. Quinn about, there is no presumption. There is no categorical approach. Just because there's guideline procedural error, we don't automatically kick it back. Now, that whole line of... Tell me what this language in Melina Martinez means, because I'm trying to come up with some definition in my own mind of where you come out. The Supreme Court says in a couple of places, here's one of them, when a defendant is sentenced under an incorrect guidelines range, whether or not the defendant's ultimate sentence falls within the correct range, the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome. Yes. And that's the line of cases I think this court should consider. But the key word there is can and might. And as the court pointed out earlier... Most often will. Most often will. That's right. But we're saying that this is not the ordinary case. Defense counsel wants this to be the ordinary case because there's an inconvenient truth here, which is that it's a very particularized sentencing record, as well as a very particularized 2255 ruling that shows a window into Judge Bedard's intent in this case, and the 46 months is the record that he was... So what standard is the appellate court to use in this circumstance where you don't have an alternative finding that's clear on the record? How are we supposed to go into the sentencing record without that specificity and define whether or not it's sufficient in a particular case? Yes. So there are no magical words. And as Melina makes very clear, that... Well, there are magical words in the sense if you get the district court who says, and I'm making an alternative grounding for my sentencing opinion because even if I got the guidelines wrong, you still get the same thing. Here are the reasons why. So we don't have that. That's correct. So in this case, like a lot of other cases, what's the appellate court supposed to do? What's our guideline to figure this out? Well, I think there has to be a constant indication here. And I think you have to go to the record of the sentencing hearing. And what you don't have in this case is where the court is saying, I want the minimum. I'm relying on the minimum. So you don't have that here as well. Also, too, the court hasn't talked about the 2255 ruling, which I'd like to address a little bit. Here, the same judge who handled the sentencing also handled the 2255 review. And counsel would ask that this court not consider Chief Judge Bedard's assessment, post hoc assessment, of the probability. He calls it a post hoc rationalization, which I think is unfair and slightly cynical. The judge here, this court has the good fortune to see that the sentencing judge had a chance to do a post hoc assessment of the probability. The same judge who would do the post hoc assessment if this case is remanded. That's part of this record. And what Molina also says, crystal clear, it says that the record below, the record by the judge, including the judge's statement, the circumstances control what should happen next. And then Molina says, look at the Seventh Circuit. Look at U.S. v. Curry. They ask for a post hoc assessment from the lower court before it gives a full remand. They'd like to know, hey, sentencing judge, what is your assessment here? Are you going to give the same sentence? If you correct this error, given this error, would that have affected what you would have given at the time of sentencing? And in that limited remand, it's by letter, I believe, a Seventh Circuit judge, district judge, would say, yes, I would, or no, I wouldn't. Or I'm not sure, I need to have another hearing. I've got to think about it. So what the court has here, the court doesn't need to do a limited remand. It already has the limited remand. It has a post hoc assessment in the 2255 where Judge Bedard could not have been clearer. So then, really, in the 2255 hearing, then the judge can cover his or her tracks, is what you're saying, and can say, no, I wouldn't have done it. And we have to go with that. I mean, aren't we... And I understand that United States v. Allmendinger isn't directly on point, but didn't we make the point in that case that you're focusing on what was going on at the time of the appeal, what the sentencing judge said in the trial, not what the sentencing judge might have said during the habeas hearing? Your Honor, as his Honor said, in sentencing hearings themselves, many judges will do a post hoc assessment and this Court condones that. In other words, after we do a guidelines assessment... Well, I don't want a post hoc assessment. This is at the same sentencing hearing where the Court makes an alternative finding, so there's nothing post hoc about that. Well, there is a separate finding, a separate assessment. There's the guideline 3553 sentencing hearing. And then, in some of the cases, as Your Honor pointed out, and this Court has condoned this, the Court will say to protect itself, not to immunize, not to cover its tracks. Right, but I understand, but I think you're deflecting the argument, or the question. The question isn't that a court could have said things at the sentencing. The question is, why are we governed by what the Court says at the habeas? It seems to me that it creates a potentially troublesome path. That all the Court has to do is say some magic words. There's no reasonable probability that I would have done something different. I did what I intended to do. And so, that would create a situation where you would never allow release. Why isn't that a concern? It is a concern. It's a very real concern, and that's why the record matters. And, of course, the same judge could have made the magic words at the original sentencing. Never mind what I did in the guidelines. If the Fourth Circuit finds that I've committed procedural error in the sentencing, I still would have given the same sentence. He's just immunized, in the good sense, the sentence, if he truly believes what he said. I think that Judge Keenan is raising a really good question, and a question I've had. But the way this seems to all work is if we should fine for the defendant here, we would remand to this same district judge who could do exactly the same... I mean, I'm not sure that that worry carries the day, because I don't know that our remand would cure it unless we would send to another district judge. I didn't mean to interrupt. What would be helpful as a test in these circumstances is to look at the sentencing transcript, and if it's not particularly clear on the point of what the court would do or not do, if there was no error, but the same sentencing judge later on, whether it's 10 minutes, 10 days, or 10 months, looks at it, and then gives a very reasoned, detailed, comprehensive assessment and review of what he did at that sentencing hearing, then the court knows that he's not immunizing in the bad sense. That he is providing a service for the court, saying, look, and I think that's here. So then a defendant who puts on exactly the same evidence, if there is a different judge at the habeas hearing, gets a different result. Exactly the same evidence gets a different result, depending on whether the defendant appeared in front of that judge for trial. That doesn't seem like a an outcome that this court would want. And I understand that. Well, could you answer that, though? To me, that's troubling. Let me finish if I could. It seems to me that what you're suggesting is that a defendant could get a better deal if he were in front of someone other than Judge Berdar on the exact same evidence, but because he was in front of Judge Berdar, it just wasn't his lucky day, and the exact same evidence does not carry the day. I think that's a little bit troubling. I'd like to know whether that concerns you. It does, and I think the court is right. But the facts of a particular case, according to Molina, and that's the Molina's language, the particular facts and circumstances of a case rule the day. And if it happens to be that the original judge is the judge who does the 2255 assessment, then the court has a clear indication all the way through the stream of information that comes to Your Honors. If it's a different judge, then he's not entitled to the same deference in terms of his review. He wasn't there. I'm not even sure I thought that if the habeas case went to another district judge, he would look at this record, his pages and pages of sentencing, and it would be the government's position he'd come out the same way. I don't know. That is the government's position in this particular case. But Your Honor's concern is but I understand Your Honor's concern that it could be a slippery slope if you open it up to it could with regard to the evidence. Yes. I see I don't have much time. I just wanted to stress that I believe that because of the detailed nature, the candid review, the comprehensive review and the court's broad discussion of the massiveness of this fraud outside of the limited definition of loss on the 2B1.1. It was talking about it way far away from the guidelines. It was all the other circumstances. This defendant had received so many downward adjustments for cooperation, for pleading guilty and so forth, there's no way Judge Bedard was going below 46 months, and that's the way what the record reflects here. The massiveness is the number of victims, not just the amount of money. It's the complexity, the deception, the number of co-defendants. His deplorable conduct with the other co-defendant, where he was involved in an exploitive relationship with Mr. Rosenberg. There were so many other factors that went into determining what is massive about this case beyond just 2B1.1. Thank you very much. Mr. Quinion, Senator Butler. So, is there a difference that we had the same district judge in the 2255 as to the sentencing here? Would it make a difference if it had been another judge? I don't think so, and I think you can look to the U.S. Court of Appeals for the Second Circuit's decision in Johnson for the answer there. In Johnson, the facts were highly analogous to this case. We had a sentence that was imposed at the very bottom of the relevant guidelines range, and the judge erred by imposing a sentence that reflected a two-level offense-level enhancement. And the judge at the 2255 stage in that case said, no, I don't need to correct this. There was no prejudice because he could have received that same sentence under the lower guidelines range. And the U.S. Court of Appeals for the Second Circuit said, no, that's no answer. There's no cure for the  same judge. We look at the record cold, our review is de novo, and we find that on the basis of the record here, it was unsupported that the sentence would have been the same. Going back, though, I thought that was in response to the line, the good line of questioning that Judge Keenan raised, which was, it's troubling that you have the same judge. And what you're saying, no, it's not troubling at all because the standard is exactly the same. I don't think it's necessarily not troubling. So you want to have it both ways? I'm just trying to suggest that the fact that it's the same judge on remand isn't a reason not to remand. And the fact that it's the same judge that did the sentencing in the 2255 isn't a reason not to take a very neutral, cold look at the actual sentencing transcript. Because as the Second Circuit said in Johnson, it's the sentencing transcript and the evidence it's sentencing that's the important evidence here, rather than what the judge said on 2255. I think the government is proposing a rule that would allow district judges to hear any guidelines there in a 2255 just by saying that I would have done the same thing anyway. I don't think that that I didn't read it that way. I think the resolution of this case depends on how concerned we are about the particular factors of this sentencing or how without magic words where the standard is and I think that's where it seems to me. I think you've laid your finger on it. And I think Judge Agee asked what's an appellate court to do in this circumstance? What you do on direct review, the standard you apply is if you're not certain that the result would have been the same, but for the error, you remand. That's the standard that Savio Matute set out. That's the standard the court applied in Montes Flores. So if the court under very similar circumstances in direct review wants a framework to analyze the error in this case, it should ask itself whether it's certain that the result would have been the same. I'm not aware of a case having held that in the ineffective assistance context before, but it has held that repeatedly in the direct review context. So you need to analyze the transcript and look at it, and if you're not seeing a consistent indication that the result would have been the same, but for the guidelines error, if you're not certain that the result would have been the same, you can remand for resentencing in this case. And I think that's just a reflection of the way the guidelines work. As Your Honor said, and Valina Martinez and Rosales Mireles, the Supreme Court has repeatedly reiterated that a guidelines error itself and nothing more is, in the usual case, sufficient to demonstrate a reasonable probability of prejudice. I just want to address one thing that the government appeared to suggest. I heard the government make a little bit of an argument that maybe there wasn't any sentencing error in this case and that the loss amount was correct in the first time the district court went at this in sentencing. And I don't think that's accurate. I think, number one, the government has forfeited that argument and agreed in its briefing that the district judge did err in this case, did apply the wrong guidelines range. So to the extent it's now coming back and suggesting that maybe the district judge didn't commit an error here, I think that argument is foreclosed. Just to wrap up finally, your honors, I think Judge Motz, you're right. I think you just need to take a cold look at the guideline range, ask yourself whether you're seeing anything in that transcript that suggests the guidelines didn't matter at sentencing, and then make your decision on that basis. I think there's magic words, there's criteria that you can look to, you can apply the standard on direct review.  sentencing transcript at the end of the day is the basis for the sentence here, and I think that's the most important thing in the appeal. Thank you very much. We understand that you're court appointed. We very much appreciate your efforts. We really couldn't do our work if we didn't get excellent lawyers like you to present their cases. Well, we have a very, very tight schedule today, so we're going to ask the clerk to adjourn the court. We really did have other cases. Council had problems. This honorable court stands adjourned until 3 p.m. this afternoon. God save the United States and this honorable court.
judges: Diana Gribbon Motz, G. Steven Agee, Barbara Milano Keenan